**UNITED STATES**

v.

**Joseph D. TIBBETTS, 021 42 2668, Boatswain's Mate Second Class (E-5), U. S. Navy.**

**NCM 76 1758.**

U. S. Navy Court of Military Review.

Sentence Adjudged 23 April 1976.

Decided 1 Nov. 1976.

LT Lawrence S. Smith, JAGC, USNR, Appellate Defense Counsel.

LT Patrick A. Fayle, JAGC, USN, Appellate Government Counsel.

Before CEDARBURG, C. J., and MURRAY and GLASGOW, JJ.

CEDARBURG, Chief Judge:

Appellant was convicted by general court-martial with members, of assault with a dangerous weapon in violation of Article 128, UCMJ, 10 U.S.C. § 928. The court sentenced him to a bad conduct discharge, confinement at hard labor for one year and reduction to pay grade E–1. The convening authority approved the findings and sentence.

Appellant asserts that the military judge prejudicially erred in admitting into evidence statements made by appellant in violation of Article 31, UCMJ. We agree and reverse.

On 5 November 1975, a woman employee of a naval weapons facility was cut with a knife in the parking lot adjacent to the Bachelor Civilian Quarters (BCQ) at that installation. A Naval Investigative Service Agent, Special Agent E. was summoned to investigate the incident. Along with Mr. P., the security officer of the facility, the agent interviewed the victim, several residents of the BCQ, and a guard at an interior guard station.

As a result of his interviews Special Agent E. was aware that the assailant was a male Caucasian in his twenties, slender and well built, approximately five feet nine inches tall, with light colored wavy shortcut hair, wearing jeans with no jacket. Several of the BCQ residents had seen a golden or yellow-colored van parked in the lot of the BCQ earlier that evening. One of them recalled seeing the same van parked in the BCQ lot on the preceding evening also. The guard on the interior guard station heard screams coming from the area of the BCQ shortly after 1900, the approximate time of the assault and a few minutes later passed a yellow van, whose driver appeared to be a male Caucasian, through the guard post towards a diving barge which was berthed at the "boat yard" portion of the facility. At that time of night it was necessary to pass through the interior guard post to reach the "boat yard."

Special Agent E. and Mr. P. proceeded to the diving barge after interviewing the guard. A Master Chief aboard the barge confirmed that the owner of the yellow van parked in the parking area adjacent to the barge was in diver training and was at that time in the berthing compartment in his "rack." Appellant was summoned to the galley where Special Agent E., Mr. P. and the Master Chief were waiting. Appellant appeared, wearing a pair of dungarees or jeans and fitted the general description of the assailant given by the victim.

During the entire period on the diving barge, no warning pursuant to Article 31, UCMJ or *Miranda/Tempia* was given to appellant. Special Agent E. averred that

he did not suspect appellant of the assault when he went aboard the barge to question him. He felt that appellant was possibly in the area of the assault and could provide information leading to the individual responsible. According to Special Agent E., only after talking to him as a possible witness and when he considered appellant to be evasive in his answers did he consider him to be suspect and thereafter obtain appellant's permission to accompany him to the security office where warnings under Article 31 and *Miranda/Tempia* were given.

▇ The information available to Special Agent E. at the time of, and the circumstances surrounding the initial questioning of appellant were such, that we conclude that the statements made by appellant to Special Agent E. were inadmissible because they were obtained in violation of his Article 31 rights.

▇ Special Agent E. testified that he did not suspect appellant at the time of the initial interview. His testimony is not conclusive, however. It merely raises a factual issue. *United States v. Gorko*, 12 U.S.C.M.A. 624, 627, 31 C.M.R. 210, 213 (1962). The facts and circumstances known to the investigator in each case determines when a warning is required. If the interrogator had reasonable grounds to suspect that the person being questioned has committed an offense a proper warning against self-incrimination must be given. *United States v. Anglin*, 18 U.S.C.M.A. 520, 40 C.M.R. 232 (1969).

Special Agent E. was in possession of substantial incriminating information when he went to question appellant on the diving barge. The security officer who accompanied Special Agent E., although not in charge of the investigation, testified that when they went to the barge and when appellant was brought to the galley he considered him a "possible suspect." On cross-examination he conceded, in response to a leading question, that he was not in possession of sufficient facts which would lead a reasonable man to believe that appellant had committed the offense. Laying aside the opinion of the fellow investigator, how-

ever, Special Agent E. was aware of the following facts:

1. A woman had been assaulted in the parking lot of the BCQ with a knife.
2. A golden or yellow van had been observed in the parking lot of the BCQ on the evening of the attack. It had been observed on the preceding evening also but was not known to belong to a resident.
3. An interior gate guard passed a yellow van, driven by a male caucasian, from the portion of the station where the BCQ was located to the "boat yard" area shortly after the time of the assault after hearing screams from the area of the BCQ.
4. Entry into the "boat yard" area of the station at that time of night was possible only through that interior gate.
5. The victim identified the assailant as a male caucasian in his twenties, slender but well built, about five feet nine inches tall with light colored, wavy, short-cut hair, wearing blue jeans.
6. The yellow van which the investigator ascertained belonged to appellant, was parked in the parking lot adjacent to the diving barge.
7. The assailant's general description corresponded to appellant.
8. Appellant was dressed in dungarees or jeans when he reported to the barge galley for questioning.

These facts alone support an objective conclusion that the interrogator had reasonable cause to believe that appellant committed the offense he was investigating. The questions posed to appellant by the special agent on the diving barge makes suspect the investigator's disclaimer of subjective suspicion. The questioning on the diving barge was accomplished before any warning was given. The exact order of questions is not established but the following questions were asked without any warning being given and support a conclusion that incriminating statements were being sought:

1. Whether appellant had been in the area of the BCQ that evening;

2. What clothes he had been wearing;

3. Whether he owned a knife;

4. Whether he would furnish the knife (which he did, before he and the investigators left the diving barge).

We are convinced, under the circumstances, that the interrogator had reasonable grounds for suspecting appellant and the questions asked were designed and geared to elicit a statement of incrimination. The warning requirements of Article 31 and *Miranda/Tempia* were thus applicable. *See, United States v. Graham*, 21 U.S.C.M.A. 489, 45 C.M.R. 263 (1972).

 After appellant was taken to the security office, he was given Article 31 and *Miranda/Tempia* warnings. He was not, however, warned that his prior unwarned statement was inadmissible and could not be used against him. The subsequent incriminating statement he made after the warning was likewise inadmissible. *United States v. Anglin, supra; United States v. Bennett*, 7 U.S.C.M.A. 97, 21 C.M.R. 223 (1956). The presumptive influence of the first statement on the latter one in this case has not been overcome. *United States v. Hundley*, 21 U.S.C.M.A. 320, 45 C.M.R. 94 (1972). Significant factors bearing on whether the presumptive taint of the former interrogation had not been overcome are not present in this case. The second statement was taken a short time after the inadmissible statement was obtained on the diving barge. The interrogator was the same one who had elicited the inadmissible statement. The appellant never acknowledged that his subsequent incriminating admissions were uninfluenced by his prior admission. And, finally, the information and physical evidence in the form of the knife acquired during the unwarned first questioning provided a substantial basis on which to seek the subsequent statement. *United States v. Seay*, 1 M.J. 201 (1975).

We hold, therefore, that it was prejudicial error to admit the statements of the appellant made to Special Agent E. Reversal is required.

The findings and sentence are set aside. A rehearing may be ordered.

Judge MURRAY concurs.

GLASGOW, Judge (dissenting):

Contrary to his plea the appellant was found guilty of assault with a dangerous weapon, a knife, in violation of Article 128, UCMJ, and sentenced by a general court-martial, with members, to a bad conduct discharge, confinement at hard labor for one year and reduction to pay grade E–1. The sentence has been approved on review below.

The appellant assigns the following as errors:

I. THE MILITARY JUDGE PREJUDICIALLY ERRED BY ADMITTING INTO EVIDENCE STATEMENTS MADE BY APPELLANT IN VIOLATION OF ARTICLE 31, UCMJ.

II. THE GOVERNMENT FAILED TO PROVE TO THE COURT BEYOND A REASONABLE DOUBT THAT APPELLANT'S STATEMENTS WERE NOT MADE IN VIOLATION OF ARTICLE 31, UCMJ.

I

In this case the appellant was questioned by the investigating officer as a potential witness prior to a warning pursuant to Article 31, UCMJ. Then following a proper warning the appellant made a confession. The appellant contends that the ruling in *United States v. Anglin*, 18 U.S.C.M.A. 520, 40 C.M.R. 232 (1969), requires that we reverse the conviction.

This matter was thoroughly considered by the military judge at trial prior to the entering of a plea, who also considered, *inter alia, United States v. Anglin, supra; United States v. Seay*, 1 M.J. 201 (1975) and *United States v. Collier*, 49 C.M.R. 719 (A.C.M.R.1975).

About 1915 5 November 1975, Miss S., a civilian employee, was assaulted with a knife in the parking lot near her quarters at the Naval Surface Weapons Center, Dahl-

gren, Virginia. Special Agent E. of the Naval Investigative Service began his investigation about two hours later. About two hours after beginning his investigation Special Agent E. called the appellant from his sleep to ask him some questions. The information apparently known to Special Agent E. at the time he first questioned the appellant is set forth in the majority opinion.

Special Agent E. described his initial interview with the appellant in the following colloquy:

Q. What did you expect to ascertain from speaking with the accused?

A. Well, specifically anything that could assist me in developing the investigation further. It was my feeling that he was possibly in the area where the alleged incident took place and that perhaps he could provide me with information which could lead to the individual responsible for the assault.

Q. When the accused appeared on the barge, did you talk to him.

A. Yes, I did.

Q. Would you please relate to the court what you talked to him about and the questions that you asked him?

A. Yes, he identified himself to me and I identified myself to him. I told him that there had been a cutting on board the station that we were looking into and I asked him if he had been away from the barge that evening. He said that he had. He said that after working hours, I believe, shortly after 1630 or thereabouts, he had driven in his van from the barge onto the main part of the Naval Weapons Laboratory and had gone to the Navy Exchange, and after visiting the exchange for a short while had proceeded to the Cannonball Club which is close by and had spent something within an hour and a half or an hour and forty-five minutes at the Cannonball Club. He had left the Cannonball Club alone and had driven directly off the station into the town of Dahlgren via the main gate, and that his purpose for going into town of Dahlgren was to look for a bar that he had heard about at which there were go-go dancers. He stated that he spent approximately fifteen minutes looking around Dahlgren. He wasn't familiar with the town and that he didn't find the bar with go-go dancers, in fact, he didn't find a bar at all, and returned back through the main gate onto the station and drove directly to the parking area adjacent to the barge in the boot yard. He said that he then went aboard the barge, did some exercises and hit the rack and had gone to sleep. The next thing he knew about he was talking to me.

Q. Did the accused voluntarily talk to you?

A. Yes, he did.

Q. At what point did the accused become a suspect?

A. At the point where he insisted that he had not made any stops either on his way off the station into the town of Dahlgren or on his way back into the station. I specifically asked him if he made any stops in any parking lots, if he had parked behind the BCQ or the BEQ or the gymnasium. He insisted that he had not stopped at any of those places and he wasn't sure which building was which anyway.

Q. When you had determined in your mind that the accused had become a suspect, did you cease all questions?

A. Yes, at that point I asked him if he would be willing to come with me to the security office for further questioning. He agreed to do this.

At the security office the appellant was fully warned pursuant to Article 31, UCMJ, and admitted assaulting Miss S. The vital question here is whether Special Agent E. was reasonable in his determination that the appellant was a possible witness rather than a suspect at the first interview. In *United States v. Anglin, supra,* Judge Ferguson, speaking for the majority of the Court of Military Appeals, stated:

The facts and circumstances of each case determine if an accused is, at the time of interview, a suspect and, therefore, entitled to the full protection of the

law relating to self-incrimination. In the case at bar, the record reflects that Agent Gordon was aware, before he interrogated the accused, of the following facts:

1. The victim was dead.

2. His death appeared to have been the result of some kind of accident.

3. A rather aged Ford automobile with a light top and dark body was observed stuck at the scene and later removed to an unknown location without rendering assistance to the victim or reporting the accident to the proper authorities.

4. The accused owned an automobile of that somewhat unusual description.

5. The accused had been in the victim's company on the previous evening.

Are these data sufficient to serve as a basis for a holding that the interrogator had reasonable grounds to believe that the accused had committed an offense? We believe that they are. Cf. *United States v. Doyle*, 9 U.S.C.M.A. 302, 26 C.M.R. 82.

While information available to the investigator prior to his contact with the accused in the case *sub judice* is somewhat similar to that available in the *Anglin* case, I note some material differences. In *Anglin* the accused was known to have had personal contact with the victim. Here he was known to have been in the area of the crime. In *Anglin* the accused's vehicle was suspected to have been the death weapon. Here the accused's vehicle was known to have been in the area of the assault. In *Anglin* there were known facts sufficient to suspect that the accused was connected with the crime. Here it was known that a person fitting the general description of the accused was involved in the crime.

Mr. P., Director of Security at Dahlgren, accompanied Special Agent E. in his initial interview with the appellant. Mr. P. stated that he considered the appellant to be "a possible suspect" but that the information then at hand would not lead a reasonable man to suspect that the appellant had committed the offense under investigation.

Mr. P. asked no questions of the appellant at that time and he was not in charge of the investigation. It is the reasonableness of Special Agent E.'s determination, that the appellant was not then a suspect, that must be decided. *United States v. Anglin, supra; United States v. Seay, supra; United States v. Collier, supra; United States v. Foecking*, 22 U.S.C.M.A. 46, 46 C.M.R. 1237 (1973); *United States v. Shafer*, 13 U.S.C.M.A. 83, 32 C.M.R. 83 (1962); *United States v. Bennett*, 7 U.S.C.M.A. 97, 21 C.M.R. 223 (1956). The trial judge, who saw and heard the witnesses, had all this information before him and determined that Special Agent E.'s decision was reasonable. I think the trial judge made the correct decision. I would therefore reject the first assignment.

## II

I would find no merit in the second assignment.

## PROMULGATION

I would find prejudicial error in the promulgating order. The charge sheet originally alleged the offense of which the appellant stands convicted (in a lesser degree) and also alleged the same incident as an "assault with intent to commit rape." After the Article 32 investigation the staff judge advocate found insufficient evidence to support that allegation and on his recommendation the convening authority did not refer the intent to rape charge to trial. Nevertheless the promulgating order shows the intended rape specification with the notation "withdrawn by order of the convening authority before arraignment." Inasmuch as that charge was not referred to trial such a notation is incorrect and the inclusion of the allegation of the more serious offense appears as prejudicial error. While the appellant was neither tried nor convicted of an offense involving intended rape, the allegation of that crime was forwarded to the appellant's place of confinement and to the Naval Clemency and Parole Board. I would eliminate further confinement of the appellant to compensate for the prejudicial effect of this error.

Accordingly, I would affirm the findings and only so much of the sentence as provides for a bad conduct discharge, confinement at hard labor for six months, and reduction to pay grade E–1.